

FILED
CLERK, U.S. DISTRICT COURT

JUN - 6 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                     January 2019 Grand Jury

11  UNITED STATES OF AMERICA,          CR19-00339-SVW

12              Plaintiff,             I N D I C T M E N T

13         v.                          [18 U.S.C. § 1349: Conspiracy to
                                       Commit Wire Fraud; 18 U.S.C.
14  ARGISHTI KHUDAVERDYAN,             § 1343: Wire Fraud; 18 U.S.C.
         aka "Argo,"                   § 1344(2): Bank Fraud; 18 U.S.C.
15       aka "George Gale,"            § 1030(a)(2)(c), (c)(2)(B)(i),
         aka "akhudav1," and           (c)(2)(B)(ii): Unauthorized Access
16  ALEN GHAREHBAGLOO,                 to a Protected Computer to Obtain
         aka "aghareh1,"               Information; 18 U.S.C.
17                                     § 1030(a)(4), (c)(3)(A): Accessing
              Defendants.              a Computer to Defraud and Obtain
18                                     Value; 18 U.S.C. § 1956(h):
                                       Conspiracy to Launder Monetary
19                                     Instruments; 18 U.S.C.
                                       § 1956(a)(1)(B)(i): Laundering of
20                                     Monetary Instruments; 18 U.S.C.
                                       § 1957(a): Engaging in Monetary
21                                     Transactions in Property Derived
                                       from Specified Unlawful Activity;
22                                     18 U.S.C. § 1028A(a)(1):
                                       Aggravated Identity Theft; 18
23                                     U.S.C. § 2(a): Aiding and
                                       Abetting; 18 U.S.C.
24                                     §§ 981(a)(1)(C), 982(a)(1),
                                       982(a)(2)(A), 982(a)(2)(B), and
25                                     1028 and 28 U.S.C. § 2461(c):
                                       Criminal Forfeiture]
26

27      The Grand Jury charges:

28

COUNT ONE

[18 U.S.C. § 1349]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

Defendants and Co-Conspirators

1.   Defendant ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") was a resident of Northridge or Burbank, California.  From on or about January 18, 2017, to on or about June 17, 2017, defendant KHUDAVERDYAN was a co-owner of a T-Mobile Premium Retail ("TPR") store called Top Tier Solutions Inc. in Los Angeles, California, which is a sub-dealer of Portables Unlimited.

2.   Defendant ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO") was a resident of Glendale or Montrose, California. From on or about January 18, 2017, to on or about June 17, 2017, defendant GHAREHBAGLOO was a co-owner of a TPR store called Top Tier Solutions Inc. in Los Angeles, California, which is a sub-dealer of Portables Unlimited.

T-Mobile and Metro

3.   T-Mobile US, Inc. ("T-Mobile") was a company with headquarters in Bellevue, Washington, and offices throughout the United States and Puerto Rico.  Metro by T-Mobile (formerly known as MetroPCS) was a company with headquarters in Richardson, Texas, that was acquired by T-Mobile USA on or about May 1, 2013.  T-Mobile did not have any email servers in California.

4.   T-Mobile sold cellular devices including phones and offered monthly voice and data plans for use with the devices on the T-Mobile wireless network.  T-Mobile devices and wireless services were sold

2

through authorized T-Mobile dealers and retailers, including TPR stores, throughout the United States and Puerto Rico.

5.   New cellular devices, such as iPhones, cost hundreds of dollars, with many top-end models costing approximately $500 to $1,000.  To make phones more affordable, T-Mobile, in or about March 2013, began to provide customers with the option to purchase phones on an interest-free equipment installment plan.  To be eligible, customers were required to meet a minimum credit profile to qualify for financing for up to 24 months, which in turn locked their devices to T-Mobile's wireless network.  The equipment agreement between T-Mobile and each of its customers provided that T-Mobile would unlock the customer's phone upon the satisfaction of certain criteria, such as when the customer had satisfied the terms of her or his equipment installment plan.

6.   T-Mobile used proprietary locking software on cellular devices' International Mobile Equipment Identity ("IMEI") numbers to prevent the locked devices from being used on other cellular service providers' networks.

7.   "Unlocking" or "whitelisting" a phone removed the proprietary locking software and thereby allowed the phone to be used on other cellular providers' mobile networks rather than exclusively with T-Mobile.  "Blocking" or "blacklisting" a phone rendered it ineligible for activity on the T-Mobile network and was done by authorized T-Mobile employees, for example, if the phone was reported lost or stolen.  Removing a block on a phone was also referred to as "unblocking" or "cleaning" the phone, which, together with unlocking and whitelisting, is collectively referred to herein as unlocking.

8.    Unlocked phones were a valuable commodity because they could be resold and used on any other compatible network around the world.   If a T-Mobile customer's phone was unlocked, that customer could switch to another carrier.   If this happened without authorization, T-Mobile would be deprived of the remaining value of the customer's service revenues and, if applicable, remaining payments under the customer's equipment plan.

9.    Personnel at T-Mobile's call centers, which are located across the United States and around the globe, had access to T-Mobile's computer systems and internal network to assist T-Mobile customers with service and billing issues.   Among other things, certain authorized T-Mobile employees at the call centers had the ability to submit device unlock requests on behalf of eligible customers.

10.   T-Mobile's mobile device unlocking application, called the Mobile Device Unlock ("MDU") tool, was the proprietary application used by authorized T-Mobile employees to unlock an Android phone.

11.   T-Mobile's IMEI blocking tool (the "IMEI tool") was the proprietary application used by authorized T-Mobile employees to remove a block, thereby re-enabling the device to access T-Mobile's cellular network.

12.   Until on or about March 22, 2017, both the MDU and IMEI tools were accessible to authorized users with valid T-Mobile employee credentials through the internet, after which the MDU and IMEI tools were only accessible to authorized users through T-Mobile's internal and protected corporate network.

13.   Metro by T-Mobile had its own cell phone unlocking tool for Metro cell phones called "MCare Unlock" (the "MCare tool"), which was

4

a web-based tool hosted externally to T-Mobile and designed for use by Metro business support personnel and external call center customer service representatives.  No end user authentication was required to use the MCare tool.  Access to the MCare tool was based off a set of IP address blocks assigned to T-Mobile/Metro locations.

14.  TPRs were independently owned T-Mobile premium retailer partner locations that were authorized to sell T-Mobile accessories, handsets, and service to customers.  TPR dealers had access to the MDU tool until on or about December 16, 2016.

Definitions

15.  Phishing was the fraudulent practice of sending emails purporting to be from a reputable or familiar source, such as a friend or employer, financial institution, social media company, or internet service provider, to victims in order to induce the victims to reveal sensitive information, such as: names, addresses, Social Security numbers, dates of birth, and mothers' maiden names (collectively, "PII"); and employee usernames and passwords (collectively, "employee credentials").  In a typical phishing scheme, the phishing email contains a link to a website that purports to be a legitimate business website but is, in fact, operated by a computer attacker.  The website prompts the victim to enter his or her PII and/or employee credentials, which is then collected and delivered to a server or an email account belonging to the computer attacker.

16.  A media access control ("MAC") address is a hardware identification number assigned by the manufacturer that uniquely identifies each digital device that connects to a network.  A MAC address can be changed using software.

17.   J.P. Morgan Chase & Co. ("Chase") was a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation.

18.   Google LLC ("Google"), located in Mountain View, California, operated computers used by subscribers all over the world in interstate and foreign commerce and communications, and did not have any email servers in California.

19.   PayPal Holdings, Inc. ("PayPal") was a U.S. company that operated a worldwide online payment system that supported online money transfers.   PayPal was a wholly-owned subsidiary of eBay Inc. until on or about July 18, 2015, when PayPal became an independent company.   PayPal's Mass Payment feature enabled a PayPal business account to send money to a group of up to 5,000 people at once as long as individual payments did not exceed $10,000.

B.   OBJECT OF THE CONSPIRACY

20.   Beginning on a date unknown to the Grand Jury but no later than August 26, 2014, and continuing through on or about January 20, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants KHUDAVERDYAN and GHAREHBAGLOO and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

C.   MANNER AND MEANS OF THE CONSPIRACY

21.   The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

a.   Defendants KHUDAVERDYAN and GHAREHBAGLOO would advertise their cell phone unlocking services to potential customers, and would falsely claim that their T-Mobile unlocks were official and

directly through T-Mobile, through email and websites they controlled such as unlocks247.com and swiftunlocked.com.

   b. Defendants KHUDAVERDYAN and GHAREHBAGLOO would obtain the IMEI numbers of cell phones that customers wanted unlocked by offering customers the ability to enter the IMEI numbers on websites defendants KHUDAVERDYAN and GHAREHBAGLOO controlled, which would generate emails with the IMEI numbers that would be sent directly to an email address controlled by defendant KHUDAVERDYAN.

   c. Defendants KHUDAVERDYAN and GHAREHBAGLOO also would obtain the IMEI numbers of cell phones that customers wanted unlocked by exchanging emails with each other, their customers and potential customers, and brokers offering unlocking services.

   d. In order to gain access to T-Mobile's protected internal computers without authorization and in excess of authorization, defendant KHUDAVERDYAN would obtain employee credentials of T-Mobile employees through various means, including by causing phishing emails to be sent via the wires in interstate and foreign commerce to T-Mobile employees.  Those emails appeared to be legitimate T-Mobile correspondence with links to websites that defendant KHUDAVERDYAN controlled, such as verifying-mail.us, which would request that the employees log in with their employee credentials so that defendant KHUDAVERDYAN could harvest the T-Mobile employees' credentials when they were entered into the websites. Defendants KHUDAVERDYAN's and GHAREHBAGLOO's objective was to sell to members of the public the resulting ability fraudulently to unlock phones, so that members of the public could stop using T-Mobile's services and thereby deprive T-Mobile of the stream of payments it

was owed under the customers' service contracts and installment plans.

      e.    Defendants KHUDAVERDYAN and GHAREHBAGLOO, assisted by the person known as Individual A, used the Wi-Fi access points of T-Mobile Stores to log into T-Mobile's internal network using compromised employee credentials, and used the MDU, IMEI, and MCare tools to unlock cell phones originally issued for T-Mobile's network even though neither defendant KHUDAVERDYAN nor defendant GHAREHBAGLOO had authorization to use those tools.

      f.    Defendants KHUDAVERDYAN and GHAREHBAGLOO would be paid for unlocking cell phones, including, by way of example, the following payments:

      i.    Defendant KHUDAVERDYAN received in his PayPal account ending in 7206:

      (I)    approximately 40 payments totaling approximately $551,799.91 from the PayPal account ending in 4028;

      (II) approximately 546 payments totaling approximately $5,297,790 from the PayPal account ending in 4376;

      (III)    approximately 1,186 payments totaling approximately $10,766,321.50 from the PayPal account ending in 2898; and

      (IV) approximately 119 payments totaling approximately $1,195,492.86 from the PayPal account ending in 1200.

      ii.    Defendant GHAREHBAGLOO received in his PayPal account ending in 1813:

      (I)    approximately 87 payments totaling approximately $859,482.79 from the PayPal account ending in 1200;

(II) approximately 23 payments totaling approximately $220,020 from the PayPal account ending in 4376; and

(III)     approximately 113 payments totaling approximately $1,084,306.15 from the PayPal account ending in 2898.

D.   OVERT ACTS

22.   On or about the following dates, in furtherance of the conspiracy, and to accomplish its object, defendants KHUDAVERDYAN and GHAREHBAGLOO and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California, and elsewhere:

Overt Act No. 1:     On or about February 26, 2015, defendant KHUDAVERDYAN registered the domain unlocks247.com in the name of his cousin with the U.S. domain name service provider GoDaddy.com.

Overt Act No. 2:     On or about January 12, 2016, defendant KHUDAVERDYAN registered the domain newunlock.com with the U.S. domain name service provider Wild West Domains LLC, for which he later solicited help to build a new banner ad design for his "Cell Phone Unlocking Business."

Overt Act No. 3:     On or about February 23, 2016, defendant KHUDAVERDYAN emailed Phantom Software, a phishing software provider, and stated: "I have an unlocking site and Im interested in buying your software."

Overt Act No. 4:     On or about April 17, 2016, defendant KHUDAVERDYAN received an email with a link to T-Mobile's internal employee credential registration portal.

Overt Act No. 5:     On or about April 18, 2016, defendant KHUDAVERDYAN received an email with the message "symnatec setup bro,

9

read it," and attaching T-Mobile's internal instruction manual for installing a Symantec authentication token to enable the use of T-Mobile's web-based email system.

Overt Act No. 6:    On or about April 22, 2016, defendant KHUDAVERDYAN received an email with a link to T-Mobile's web-based email system.

Overt Act No. 7:    On or about April 22, 2016, defendant KHUDAVERDYAN received an email with the compromised employee credential of the T-Mobile employee with the initials C.R.

Overt Act No. 8:    On or about May 20, 2016, defendant KHUDAVERDYAN made a payment from his PayPal account ending in 7206 to the domain name service StableHost.com for the domain swiftunlocked.com in the amount of $149.90, an amount he paid monthly until on or about May 20, 2018.

Overt Act No. 9:    On or about May 23, 2016, defendant KHUDAVERDYAN received an email containing approximately 128 IMEI numbers, 117 of which defendant KHUDAVERDYAN unlocked using the compromised employee credential of the T-Mobile employee with the initials M.T.

Overt Act No. 10:    On or about May 24, 2016, defendant KHUDAVERDYAN registered the domain unlockitall.com with the German domain name service provider Vautron Rechenzentrum AG.

Overt Act No. 11:    On or about May 25, 2016, defendant GHAREHBAGLOO registered the domain tryunlock.com with the U.S. domain name service provider GoDaddy Inc., on which he later advertised: "Our company provides direct premium unlocking services for all phone carriers."

<u>Overt Act No. 12:</u>   From on or about May 27, 2016, through on or about July 9, 2016, defendant KHUDAVERDYAN received approximately 6,140 emails generated by his website swiftunlocked.com with a total of approximately 6,177 IMEI numbers.

<u>Overt Act No. 13:</u>   From on or about June 7, 2016, through on or about August 3, 2016, defendant KHUDAVERDYAN received approximately 6,270 emails generated by his website swiftunlocked.com from defendant GHAREHBAGLOO with a total of approximately 6,311 IMEI numbers.

<u>Overt Act No. 14:</u>   On or about August 25, 2016, defendant GHAREHBAGLOO messaged a customer that access to T-Mobile phone unlocking was "down all over" and added, "Bye bye Philippines call center."

<u>Overt Act No. 15:</u>   On or about October 7, 2016, defendant KHUDAVERDYAN received in his PayPal account ending in 4961 approximately two payments totaling approximately $305.26 from the PayPal account ending in 1200, both of which included the description "Unlocks 24/7 – Invoice."

<u>Overt Act No. 16:</u>   On or about October 13, 2016, using the PayPal account ending in 4961, defendant KHUDAVERDYAN registered the domain verifying-mail.us with the U.S. domain name service provider Name.com.

<u>Overt Act No. 17:</u>   On or about November 4, 2016, defendant KHUDAVERDYAN advertised "USA T-MOBILE UNLOCKS" on the website unlockitall.com, including an "Official Unlock App" for Android devices on the T-Mobile and MetroPCS networks.

<u>Overt Act No. 18:</u>   In or about December 2016, defendant KHUDAVERDYAN caused a phishing email to be sent to the T-Mobile

employee with the initials M.M. containing a link that, when M.M. clicked on it, redirected M.M. to the domain verifying-mail.us, from which defendant KHUDAVERDYAN harvested the employee credentials entered by M.M.

Overt Act No. 19:   On or about December 13, 2016, defendant KHUDAVERDYAN used M.M.'s employee credentials to access T-Mobile's internal network and unlock one T-Mobile IMEI number.

Overt Act No. 20:   On or about December 16, 2016, defendant KHUDAVERDYAN, using M.M.'s employee credentials, caused a phishing email to be sent from M.M.'s T-Mobile email account to the T-Mobile employees with the initials M.G. and F.Z. containing a link that, when clicked on, redirected the user to the domain verifying-mail.us, which requested the T-Mobile employees to enter their employee credentials.

Overt Act No. 21:   On or about January 13, 2017, defendant KHUDAVERDYAN emailed a customer a list of 31 T-Mobile IMEI numbers with the subject line: "T-Mobile's done" and the message "These are all unlocked yesterday . . . ."

Overt Act No. 22:   On or about January 14, 2017, defendant KHUDAVERDYAN emailed a customer a list of nine T-Mobile IMEI numbers with the subject line: "T-Mobile's done" and the message "Here is the Second Batch that was done!!!"

Overt Act No. 23:   On or about February 5, 2017, defendant GHAREHBAGLOO received in his PayPal account ending in 1813 approximately $22,000.

Overt Act No. 24:   On or about March 29, 2017, defendant KHUDAVERDYAN's T-Mobile employee credential akhudav1 was used to log

into a T-Mobile Wi-Fi access point in Palmhurst, Texas, and then used to access the website unlockitall.com.

Overt Act No. 25:   On or about April 28, 2017, defendants KHUDAVERDYAN and GHAREHBAGLOO, using their T-Mobile employee credentials akhudav1 and aghareh1, respectively, attempted to access T-Mobile's MDU tool from the Wi-Fi access point of the T-Mobile Store on Foothill Boulevard in La Crescenta, California.

Overt Act No. 26:   On or about June 9, 2017, defendant KHUDAVERDYAN engaged the services of a realtor to identify potential locations for his "UnbreakIfix business," which defendant KHUDAVERDYAN wanted to be "close enough" to the T-Mobile Store on San Fernando Boulevard in Burbank, California (the "Burbank T-Mobile") or in "very close vicinity" to the T-Mobile Store on Lankershim Boulevard in North Hollywood, California.

Overt Act No. 27:   On or about July 13, 2017, defendant KHUDAVERDYAN registered the domain unlockedlocked.com in the name of "George Gale" with the U.S. domain name service provider NameCheap Inc.

Overt Act No. 28:   On or about July 14, 2017, defendant KHUDAVERDYAN forwarded defendant GHAREHBAGLOO an email from a web designer containing a design for one of their cell phone unlocking websites, unlockedlocked.com, and an instruction to transfer services from the website unlocks247.com to it.

Overt Act No. 29:   On or about August 6, 2017, defendant GHAREHBAGLOO created a document named "week2" which contained approximately 4,525 IMEI numbers associated with services named "T-Mobile 99% PREMIUM BAD IMEI Cleaning for iPhone iPad Samsung etc" and which showed a profit report for the period between July 23 and

August 6, 2017 of approximately $12,962.93 in net profit for
defendant GHAREHBAGLOO and approximately $16,324.31 in net profit for
defendant KHUDAVERDYAN.

Overt Act No. 30:  On or about August 23, 2017, defendant
GHAREHBAGLOO, using his PayPal account ending in 1813, paid
Individual A approximately $80.

Overt Act No. 31:  On or about August 28, 2017, defendant
GHAREHBAGLOO, using his PayPal account ending in 1813, paid
Individual A approximately $300.

Overt Act No. 32:  On or about October 5, 2017, defendant
GHAREHBAGLOO emailed defendant KHUDAVERDYAN instructions to pay
approximately $7,528 to defendant GHAREHBAGLOO's PayPal account
ending in 1813.

Overt Act No. 33:  On or about October 12, 2017, defendant
KHUDAVERDYAN used the employee credentials of the T-Mobile employee
with the initials C.H. to access T-Mobile's internal network and
unlock approximately 144 T-Mobile IMEI numbers.

Overt Act No. 34:  On or about October 13, 2017, defendant
KHUDAVERDYAN used C.H.'s employee credentials to access T-Mobile's
internal network and unlock approximately 295 T-Mobile IMEI numbers.

Overt Act No. 35:  On or about November 5, 2017, defendant
GHAREHBAGLOO instructed defendant KHUDAVERDYAN to be sure to change
the MAC address of the digital device used to log into the Wi-Fi
networks of the Burbank T-Mobile and the T-Mobile store on Foothill
Boulevard in Glendale, California to conduct phone unlocks so that
the logons could not be traced back to them.

Overt Act No. 36:  Between on or about November 5 and November
13, 2017, defendant KHUDAVERDYAN used the employee credentials of the

14

T-Mobile employee with the initials A.K. to access T-Mobile's internal network and unlock or attempt to unlock approximately 1,735 T-Mobile IMEI numbers.

Overt Act No. 37: On or about November 28, 2017, defendant KHUDAVERDYAN confirmed to a customer that defendant GHAREHBAGLOO's report that defendants KHUDAVERDYAN and GHAREHBAGLOO were "close to T-Mobile iPhone unlocking" was true.

Overt Act No. 38: On or about November 30, 2017, defendant KHUDAVERDYAN messaged a customer that defendants KHUDAVERDYAN and GHAREHBAGLOO were able to successfully unlock T-Mobile iPhones and that they were "gonna make [the customer] rich."

Overt Act No. 39: On or about December 4, 2017, defendant GHAREHBAGLOO offered to send customers "a picture of the official unlock tool" to assure them that defendants KHUDAVERDYAN and GHAREHBAGLOO had access to T-Mobile's official unlock tool.

Overt Act No. 40: On or about December 5, 2017, defendant GHAREHBAGLOO modified a document called "STORE," which contained a list of approximately 126 T-Mobile stores located in southern California with a notation next to each store, including the word "ok" next to the entry for the Burbank T-Mobile.

Overt Act No. 41: On or about December 8, 2017, using coded language, defendant GHAREHBAGLOO messaged "Yes we will clean . . . ." to a customer who asked whether defendants KHUDAVERDYAN and GHAREHBAGLOO could "unlock lost/stolen [phones]."

Overt Act No. 42: On or about December 10, 2017, using coded language, defendant KHUDAVERDYAN messaged the individual associated with unlockblock.com that he had T-Mobile employee credentials and

"just need[ed] access to [T-Mobile's] network" in order to perform phone unlocks.

Overt Act No. 43:   On or about December 12, 2017, defendant GHAREHBAGLOO messaged defendant KHUDAVERDYAN with the suggestion that defendant KHUDAVERDYAN "just transfer [defendant GHAREHBAGLOO's] money to [defendant KHUDAVERDYAN's] bank and write [defendant GHAREHBAGLOO] a check" because defendant GHAREHBAGLOO "really [did]n't want to call PayPal" because "It will open up Pandora's box."

Overt Act No. 44:   On or about January 20, 2018, defendant KHUDAVERDYAN used the employee credentials of the T-Mobile employee with the initials W.G. to access T-Mobile's internal network and unlock one T-Mobile IMEI number.

Overt Act No. 45:   On or about February 1, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a list of approximately 134 IMEI numbers.

Overt Act No. 46:   On or about February 10, 2018, using coded language, defendant KHUDAVERDYAN messaged defendant GHAREHBAGLOO that he had a Python script to perform cell phone unlocks, and defendant GHAREHBAGLOO responded that he wanted to "test it" by installing it on their computer.

Overt Act No. 47:   On or about March 10, 2018, defendant KHUDAVERDYAN emailed a potential customer and stated: "Do you have stock that you need unlocked?  I can Help you move your stock if you need Unlocking help."

Overt Act No. 48:   On or about March 10, 2018, defendant KHUDAVERDYAN emailed a potential customer and stated: "Do you guys still need to unlock iPhones??  I can still help you out if you

interested in Unlocking iPhones.  We specialize in T-Mobile, Metro
and AT&T at the current moment."

Overt Act No. 49:  On or about March 11, 2018, defendant
KHUDAVERDYAN used the employee credentials of the T-Mobile employee
with the initials S.G. to access T-Mobile's internal network and
unlock one T-Mobile IMEI number.

Overt Act No. 50:  On or about March 12, 2018, defendant
KHUDAVERDYAN advertised on the internet that one of his and defendant
GHAREHBAGLOO's companies, Swift Solutions, "offer[s] Bulk cell phone
unlocking services for Wholesalers."

Overt Act No. 51:  On or about April 3, 2018, defendant
KHUDAVERDYAN emailed a potential customer and stated: "I can help you
to unlock all the iPhones if you are interested.  We have the
cheapest and fastest services worldwide."

Overt Act No. 52:  On or about April 5, 2018, defendants
KHUDAVERDYAN and GHAREHBAGLOO accessed the Wi-Fi access point of the
Burbank T-Mobile by causing Individual A to sit within approximately
five feet of the store (because the range of the access point was
approximately 20 to 30 feet) with a device that enabled their access.

Overt Act No. 53:  On or about April 5, 2018, defendants
KHUDAVERDYAN and GHAREHBAGLOO unlocked or attempted to unlock
approximately 1,561 T-Mobile IMEI numbers.

Overt Act No. 54:  On or about April 5, 2018, defendant
KHUDAVERDYAN, using the PayPal account ending in 7206, paid
Individual A approximately $200 for providing him and defendant
GHAREHBAGLOO access to the Burbank T-Mobile's Wi-Fi access point.

Overt Act No. 55:  On or about April 17, 2018, defendant
KHUDAVERDYAN forwarded to defendant GHAREHBAGLOO an email from

Customer A with a spreadsheet named "LOCKED METRO PCS AND T-MOBILE PHONES FOR [Customer A's first name]" containing approximately 635 T-Mobile IMEI numbers and 694 MetroPCS IMEI numbers.

Overt Act No. 56: On or about April 17, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a document named "[Customer A's first name] Invoice.pdf," which was an invoice for approximately $12,070.50 (at a per-unit price of $6.50) from Top Tier Solutions Inc. for approximately 1,857 IMEI numbers that were successfully unlocked.

Overt Act No. 57: On or about April 17, 2018, defendant KHUDAVERDYAN emailed Customer A the invoice prepared by defendant GHAREHBAGLOO for approximately $12,070.50 for the successful unlocking of approximately 1,857 IMEI numbers.

Overt Act No. 58: On or about April 18, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO received in their Wells Fargo joint business account for Top Tier Solutions Inc. ending in 5549 approximately $12,070.50 from Customer A.

Overt Act No. 59: Between on or about April 18 and 25, 2018, using coded language, defendant KHUDAVERDYAN agreed with a customer to unlock 1,000 and then an additional 5,000 cell phones, and the customer followed up after defendant KHUDAVERDYAN confirmed the cell phones had been submitted for unlocking with the following: "It's been 7 days, China keeps asking for unlocking updates."

Overt Act No. 60: On or about April 18, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO accessed the Wi-Fi access point of the Burbank T-Mobile by causing Individual A to sit within approximately ten to 15 feet of the store with a device that enabled their access.

Overt Act No. 61:   On or about April 18, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO unlocked and attempted to unlock approximately 1,492 T-Mobile IMEI numbers.

Overt Act No. 62:   On or about April 20, 2018, defendant KHUDAVERDYAN quoted a customer a per-unit price of $55 to unlock approximately 248 T-Mobile IMEI numbers.

Overt Act No. 63:   On or about April 21, 2018, defendant KHUDAVERDYAN, using the PayPal account ending in 7206, paid Individual A approximately $500 for providing him and defendant GHAREHBAGLOO access to Burbank T-Mobile's Wi-Fi access point.

Overt Act No. 64:   On or about April 21, 2018, defendant KHUDAVERDYAN, using the Mass Payment feature of his PayPal account ending in 7206, paid Individual A approximately $643 for providing him and defendant GHAREHBAGLOO access to Burbank T-Mobile's Wi-Fi access point.

Overt Act No. 65:   On or about April 24, 2018, defendant KHUDAVERDYAN received an email from Customer A confirming payment for the successful unlocking of approximately 1,857 IMEI numbers.

Overt Act No. 66:   On or about April 24, 2018, defendant KHUDAVERDYAN emailed Customer A an invoice in the amount of $3,334.50 for the successful unlocking of approximately 513 IMEI numbers.

Overt Act No. 67:   From on or about April 24, 2018, through on or about April 25, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO accessed the Wi-Fi access point of the Burbank T-Mobile by causing Individual A to sit within approximately ten to 15 feet of the store with a device that enabled their access.

Overt Act No. 68:   From on or about April 24, 2018, through on or about April 25, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO

unlocked or attempted to unlock approximately 4,242 T-Mobile IMEI numbers.

Overt Act No. 69:   On or about April 25, 2018, defendant KHUDAVERDYAN emailed Customer A an invoice for approximately $14,241.50 from Top Tier Solutions Inc. for the successful unlocking of approximately 2,191 IMEI numbers, with follow-up instructions for an additional approximately 2,002 IMEI numbers that were not successfully unlocked.

Overt Act No. 70:   On or about April 25, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO received in their Wells Fargo joint business account for Top Tier Solutions Inc. ending in 5549 approximately $3,334.50 from Customer A.

Overt Act No. 71:   On or about April 30, 2018, defendant KHUDAVERDYAN emailed a customer an invoice for approximately $11,115 (at a discounted per-unit price of $45) from Top Tier Solutions Inc. for approximately 247 T-Mobile IMEI numbers that were successfully unlocked.

Overt Act No. 72:   On or about May 3, 2018, defendant KHUDAVERDYAN received via email from a customer a spreadsheet named "T-Mobile iPhone List 5-3" containing approximately 972 T-Mobile IMEI numbers.

Overt Act No. 73:   On or about May 8, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO received in their Wells Fargo joint business account for Top Tier Solutions Inc. ending in 5549 approximately $7,000 from Customer A.

Overt Act No. 74:   On or about May 9, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named

"T_M_Unlock_05_09_2018" containing approximately 1,881 T-Mobile IMEI numbers.

Overt Act No. 75:   On or about May 14, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_5_14_2018" containing approximately 625 T-Mobile IMEI numbers.

Overt Act No. 76:   On or about May 17, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_5_17_2018" containing approximately 152 T-Mobile IMEI numbers.

Overt Act No. 77:   On or about May 17, 2018, defendant KHUDAVERDYAN emailed to a potential customer the following advertisement for his unlocking services: "Whether the iPhone is clean, financed, blocked or leased, we can perform convenient, factory-grade unlocks on all iPhone and iPad devices that have been iCloud locked without voiding your phone's warranty.  We've been unlocking cell phones for years, and our specialty is in providing competitive, iCloud unlocking services and Clean/Financed T-Mobile iPhone services . . . .  Unlike other companies that use 'hacking unlock' with the possibility of your iPhone being re-locked in the future, our T-mobile unlock is Official and directly through Apple and T-mobile."

Overt Act No. 78:   On or about May 18, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_5_18_2018" containing approximately 505 T-Mobile IMEI numbers.

Overt Act No. 79:   On or about May 21, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named

"T_M_Unlocks_5_21_2018_626PC" containing approximately 626 T-Mobile IMEI numbers with the message "Todays Orders."

Overt Act No. 80:   On or about May 29, 2018, defendant GHAREHBAGLOO searched the internet for the term "t-mobile block checker."

Overt Act No. 81:   On or about May 29, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_5_29_2018_821PC" containing approximately 821 T-Mobile IMEI numbers.

Overt Act No. 82:   On or about June 1, 2018, defendant KHUDAVERDYAN used the employee credentials of the T-Mobile employee with the initials J.B. to access T-Mobile's internal network and unlock one T-Mobile IMEI number.

Overt Act No. 83:   On or about June 12, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_6_12_2018" containing approximately 2,056 T-Mobile IMEI numbers and asked: "[D]o you want to ask the buyers if they want to cancel or should we just submit the orders?"

Overt Act No. 84:   On or about June 21, 2018, defendant GHAREHBAGLOO emailed defendant KHUDAVERDYAN a spreadsheet named "T_M_Unlocks_6_21_2018_1532PC" containing approximately 1,532 T-Mobile IMEI numbers and stated: "HERE IS THE LIST."

Overt Act No. 85:   On or about August 20, 2018, defendant GHAREHBAGLOO sent defendant KHUDAVERDYAN an email containing a document named "TM_Unlocks_8_20_2018," which listed approximately 1,131 IMEI numbers and phone types.

Overt Act No. 86:   On or about November 24, 2018, defendant GHAREHBAGLOO searched the internet for the term "remote software unlocking."

Overt Act No. 87:   From at least on or about November 28, 2018, through on or about January 18, 2019, defendant GHAREHBAGLOO operated the website skyviewfta.com, which advertised "Samsung Sim Unlocking Software Tool. Remotely unlock your Samsung phone to work with ANY* carrier."

Overt Act No. 88:   On or about December 10, 2018, defendant GHAREHBAGLOO sent a customer an email with the subject line "TM_Unlock_Request 12/10/2018" and attached a spreadsheet named "TM_Unlock_12_11_2018," which contained approximately 1,188 iPhone IMEI numbers and a price next to each one, all of which totaled approximately $37,652.50.

Overt Act No. 89:   On or about December 28, 2018, defendant GHAREHBAGLOO modified a document named "2018 Counts," which calculated that defendants KHUDAVERDYAN and GHAREHBAGLOO's "TOTAL Combined Profit 2018" for their unlocking business was approximately $6,904,050.84, consisting of approximately $3,452,042.91 in profit for defendant KHUDAVERDYAN and approximately $$3,452,007.92 in profit for defendant GHAREHBAGLOO.

Overt Act No. 90:   On or about January 6, 2019, defendant GHAREHBAGLOO created images of documents that were being edited with the following text: "Dear T-Mobile Retail Sales Associate, [¶] As part of our security protocol we require you to verify your contact information, please log in to your account and confirm all contact information is correct and updated" and "Dear T-Mobile account Manager [¶] As part of our Quarterly Procudure we require all T-

Mobile Mangers to verify there contact information. Please log in to your account and confirm all contact information is correct and updated. [¶] Thank you for your time and service with T-Mobile."

Overt Act No. 91:   On or about January 9, 2019, defendant GHAREHBAGLOO, using coded language, messaged a potential customer and, in response to the question, "does your tmobile iphone service support fraud too?" answered, "Yes . . . .  All supported."

Overt Act No. 92:   On or about January 19, 2019, defendant GHAREHBAGLOO inquired of a potential customer: "Do you need tmobile unbarring" and messaged, "we will start unbarring premium 24 hours."

Overt Act No. 93:   On or about January 20, 2019, defendant GHAREHBAGLOO, using coded language, messaged a customer the following: "i think my clients are splitting orders[;] they are sending some [T-Mobile IMEIs] to your dealers . . . .  [Defendant KHUDAVERDYAN's] accountant said not to do wash[;] you pay [defendant KHUDAVERDYAN] and he pays you back."

COUNTS TWO THROUGH FOUR

[18 U.S.C. §§ 1343, 2(a)]

1.    The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 19 and 21 through 22 of Count One of this Indictment as though fully set forth herein.

A.    THE SCHEME TO DEFRAUD

2.    Beginning not later than on or about August 26, 2014, and continuing through on or about January 20, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants KHUDAVERDYAN and GHAREHBAGLOO, each aiding and abetting the other, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud T-Mobile and defendants KHUDAVERDYAN and GHAREHBAGLOO's customers as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

3.    The scheme operated, in substance, as set forth in paragraphs 1 through 19 and 21 through 22 of Count One of this Indictment.

B.    USE OF WIRES

4.    On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants KHUDAVERDYAN and GHAREHBAGLOO, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

| COUNT | DATE | INTERSTATE WIRING |
|-------|------|-------------------|
| COUNT TWO | 12/16/2016 | Phishing email from defendant KHUDAVERDYAN sent by means of an interstate and foreign wire, an email account in the name of the T-Mobile employee with the initials M.M. housed at T-Mobile, to T-Mobile employees, including the employees with the initials M.G. and F.Z., containing a link that, when clicked on, redirected the user to the domain verifying-mail.us controlled by defendant KHUDAVERDYAN, which requested the T-Mobile employees to enter their employee credentials |
| COUNT THREE | 5/17/2018 | Email from defendant KHUDAVERDYAN sent by means of an interstate and foreign wire, an email account housed at Google, to a potential customer advertising defendant KHUDAVERDYAN's cell phone unlocking services, including boasting: "We've been unlocking cell phones for years," and falsely stating: "our T-mobile unlock is Official and directly through Apple and T-mobile" |
| COUNT FOUR | 6/21/2018 | Email from defendant GHAREHBAGLOO sent by means of an interstate and foreign wire, an email account housed at Google, to defendant KHUDAVERDYAN, attaching a spreadsheet named "T_M_Unlocks_6_21_2018_1532PC" containing approximately 1,532 T-Mobile IMEI numbers |

COUNT FIVE

[18 U.S.C. §§ 1344(2); 2(a)]

A.    THE SCHEME TO DEFRAUD

1.    Beginning on a date unknown to the Grand Jury but no later than May 9, 2017, and continuing through at least on or about June 23, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed and attempted to execute a scheme to obtain monies, funds, and other property owned by and in the custody and control of Chase, by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

2.    The scheme operated, in substance, as follows:

a.    Defendants KHUDAVERDYAN and GHAREHBAGLOO would falsely aver that the purchase of the house located at 512 S. Via Montana, Burbank, California 91501 (the "Via Montana Residence") was for defendant GHAREGHBAGLOO to live in as his primary residence.

b.    Defendants KHUDAVERDYAN and GHAREHBAGLOO would falsely represent to Chase that the money transferred by defendant KHUDAVERDYAN for the purchase of the Via Montana Residence was a gift for his "cousin" defendant GHAREHBAGLOO.

c.    Defendant KHUDAVERDYAN and not defendant GHAREHBAGLOO would live in the Via Montana Residence as his primary residence.

B.   THE EXECUTION OF THE FRAUDULENT SCHEME

3.   On or about June 21, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants KHUDAVERDYAN and GHAREHBAGLOO committed the following act, which constituted an execution and attempted execution of the fraudulent scheme: Defendant GHAREHBAGLOO signed a Uniform Residential Loan Application in conjunction with the purchase of the Via Montana Residence averring that it would be his primary residence and that his assets included a "gift" of $613,260.84, when in fact the Via Montana Residence was to be defendant KHUDAVERDYAN's primary residence and the $613,260.84 was not a gift to defendant GHAREHBAGLOO.

COUNT SIX

[18 U.S.C. § 1030(a)(2)(C), (c)(2)(B)(i), (c)(2)(B)(ii)]

On or about December 16, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN"), intentionally accessed without authorization and exceeded authorized access of a computer, and thereby obtained information from a protected computer, as that term is defined in Title 18, United States Code, Section 1030(e)(2)(B), that is, from the email server(s) of T-Mobile US, Inc., for the purpose of private financial gain and in furtherance of a criminal act, to wit, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

COUNT SEVEN

[18 U.S.C. § 1030(a)(4), (c)(3)(A); 18 U.S.C. § 2(a)]

Between on or about April 5, 2018, and on or about April 25, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other and other persons known and unknown to the Grand Jury in doing so, knowingly and with intent to defraud accessed and attempted to access a protected computer, as that term is defined in Title 18, United States Code, Section 1030(e)(2), that is, the computer server(s) of T-Mobile US, Inc., without authorization, and by means of such conduct furthered defendants KHUDAVERDYAN and GHAREHBAGLOO's intended fraud and obtained a thing of value, including specifically $26,312.

COUNT EIGHT

[18 U.S.C. § 1030(a)(4), (c)(3)(A)]

Between on or about November 6, 2017, and on or about November 13, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") knowingly and with intent to defraud accessed and attempted to access a protected computer, as that term is defined in Title 18, United States Code, Section 1030(e)(2), that is, the computer server(s) of T-Mobile US, Inc., without authorization, and by means of such conduct furthered defendant KHUDAVERDYAN's intended fraud and obtained a thing of value, including specifically $82,648.50.

COUNT NINE

[18 U.S.C. § 1956(h)]

A.   OBJECTS OF THE CONSPIRACY

1.   Beginning on a date unknown to the Grand Jury but no later than August 24, 2016, and continuing through on or about January 20, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed:

a.   to conduct financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, which, in fact, involved the proceeds of specific unlawful activity, namely, conspiracy to commit wire fraud, in violation of United States Code, Section 1349, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.   to conduct financial transactions in criminally derived property of a value greater than $10,000, which was derived from specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and knowing the funds represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

2.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a.   Defendants KHUDAVERDYAN and GHAREHBAGLOO purchased real estate in their own names and in others' names.

b.   Defendants KHUDAVERDYAN and GHAREHBAGLOO purchased luxury goods such as vehicles and watches.

c.   Defendants KHUDAVERDYAN and GHAREHBAGLOO made withdrawals, each more than $10,000 from PayPal Inc. ("PayPal") and bank accounts they each controlled individually and jointly.

C.   OVERT ACTS

3.   On or about the following dates, in furtherance of the conspiracy, and to accomplish its objects, defendants KHUDAVERDYAN and GHAREHBAGLOO and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California, and elsewhere:

Overt Act No. 1:   From on or about August 2, 2016, through on or about September 20, 2018, defendant KHUDAVERDYAN made at least 55 transfers, each $10,000 or over, totaling approximately $4,060,000 from his PayPal account ending in 7206 to his Chase account ending in 6783.

Overt Act No. 2:   On or about May 9, 2017, defendant KHUDAVERDYAN transferred approximately $37,500 from his J.P. Morgan Chase & Co. ("Chase") account ending in 6783 to Inter Valley Escrow for the purchase of the house located at 512 S. Via Montana in Burbank, California (the "Via Montana Residence").

33

1    <u>Overt Act No. 3:</u>    On or about May 9, 2017, defendants
2    KHUDAVERDYAN and GHAREHBAGLOO both signed a gift letter in connection
3    with the purchase of the Via Montana Residence asserting that
4    defendant KHUDAVERDYAN's transfer of $37,500 was a "gift" for his
5    "cousin" defendant GHAREHBAGLOO, who is not defendant KHUDAVERDYAN's
6    cousin.

7    <u>Overt Act No. 4:</u>    On or about May 23, 2017, defendant
8    GHAREHBAGLOO wrote a letter stating that he was "motivated" to buy
9    the Via Montana Residence because his work is "internet based" so he
10   "work[s] from home," and he "will be closer to family and friends"
11   and "will be living in a bigger house."

12   <u>Overt Act No. 5:</u>    On or about June 19, 2017, defendant
13   KHUDAVERDYAN transferred approximately $613,260.84 from his Chase
14   account ending in 6783 to Inter Valley Escrow for the purchase of the
15   Via Montana Residence.

16   <u>Overt Act No. 6:</u>    On or about June 19, 2017, defendants
17   KHUDAVERDYAN and GHAREHBAGLOO again signed a gift letter in
18   connection with the purchase of the Via Montana Residence asserting
19   that defendant KHUDAVERDYAN's transfer of $613,260.84 was a "gift"
20   for his "cousin" defendant GHAREHBAGLOO.

21   <u>Overt Act No. 7:</u>    On or about June 21, 2017, defendant
22   GHAREHBAGLOO signed a Uniform Residential Loan Application in
23   conjunction with the purchase of the Via Montana Residence, on which
24   he averred that it would be his primary residence and that his assets
25   included a "gift" of $613,260.84.

26   <u>Overt Act No. 8:</u>    On or about December 6, 2017, defendant
27   KHUDAVERDYAN emailed his accountant and asked for documents needing
28   his signature to be sent to the Via Montana Residence.

1       Overt Act No. 9:   On or about December 26, 2017, defendant
2   KHUDAVERDYAN transferred approximately $30,000 from his Chase account
3   ending in 6783 to First National Bank of Central Texas for the
4   purchase of a 2017 Land Rover Range Rover Sport sport utility
5   vehicle.

6       Overt Act No. 10:   On or about January 25, 2018, defendant
7   GHAREHBAGLOO transferred approximately $27,500 from his and defendant
8   KHUDAVERDYAN's Wells Fargo Bank ("Wells Fargo") joint business
9   account for Top Tier Solutions Inc. ending in 5549 to Wells Fargo for
10  the lease of a 2017 Mercedes-Benz S 63 AMG® coupe.

11      Overt Act No. 11:   On or about January 31, 2018, defendant
12  KHUDAVERDYAN transferred approximately $21,570 from his Chase account
13  ending in 6783 to Landmark Escrow for the purchase of the house
14  located at 19715 Eagle Ridge Lane, Northridge, California (the "Eagle
15  Ridge Residence").

16      Overt Act No. 12:   On or about March 15, 2018, defendant
17  KHUDAVERDYAN transferred approximately $374,561.56 from his Chase
18  account ending in 6783 to Landmark Escrow for the purchase of the
19  Eagle Ridge Residence.

20      Overt Act No. 13:   On or about March 15, 2018, at 9:21 a.m.,
21  defendant KHUDAVERDYAN sent an email which stated: "House will be
22  rented 19715 Eagle Ridge Lane Northridge, CA 91326 This will be under
23  my sisters name. [Name redacted]. Call me for payment . . . ."

24      Overt Act No. 14:   On or about March 15, 2018, at 9:27 a.m.,
25  defendant KHUDAVERDYAN sent another email and stated: "[Name
26  redacted] Sorry what I meant to say is I'm buying the house for my
27  sister, she will be living there . . . ."

28

Overt Act No. 15:   On or about May 1, 2018, defendant KHUDAVERDYAN transferred approximately $32,157.50 from his PayPal account ending in 7206 to Beverly Hills Watch Company for the purchase of an Audemars Piguet Royal Oak watch.

Overt Act No. 16:   On or about June 14, 2018, defendant KHUDAVERDYAN emailed the Assistant Planner for the City of Burbank and stated that he was the owner of the Via Montana Residence.

Overt Act No. 17:   On or about June 21, 2018, defendants KHUDAVERDYAN and GHAREHBAGLOO received an email from defendant GHAREHBAGLOO's wife, who was the real estate agent for the purchase of the Eagle Ridge Residence, with the subject line "Lease agreement," which attached a document that stated: "Agreement between [defendant KHUDAVERDYAN's sister], Owner(s), and Alen Gharehbagloo, tenant(s), for a dwelling located at 19715 eagle ridge lane Northridge ca 91326 (location). Tenant(s) agree to rent this dwelling on a month-to-month basis for $12,900 per month . . . ."

Overt Act No. 18:   On or about July 12, 2018, defendant KHUDAVERDYAN transferred approximately $64,124.30 from his PayPal account ending in 7206 to Creative Bespoke to lease a 2014 Ferrari 458 coupe.

Overt Act No. 19:   On or about September 13, 2018, defendant GHAREHBAGLOO transferred approximately $16,500 from his Wells Fargo account ending in 7435 to Ticor Title Company for the purchase of the business property located 207 West Alameda Avenue, Unit 203, Burbank, California 91502 (the "West Alameda Business").

Overt Act No. 20:   On or about September 28, 2018, defendant GHAREHBAGLOO withdrew $162,753.61 from his Wells Fargo account ending

in 7435 in a cashier's check to pay Ticor Title Company for the purchase of the West Alameda Business.

Overt Act No. 21:   On or about December 10, 2018, defendant GHAREHBAGLOO transferred approximately $84,000 from his Wells Fargo account ending in 7435 to Inter Valley Escrow for the purchase of the house located at 1435 El Vago Street, La Cañada Flintridge, California 91011 (the "La Cañada Flintridge Residence").

Overt Act No. 22:   On or about December 13, 2018, defendant GHAREHBAGLOO transferred approximately $750,000 from his Wells Fargo account ending in 7435 to Inter Valley Escrow for the purchase of the La Cañada Flintridge Residence.

Overt Act No. 23:   On or about December 24, 2018, defendant GHAREHBAGLOO transferred approximately $750,000 from his Wells Fargo account ending in 7435 to Inter Valley Escrow for the purchase of the La Cañada Flintridge Residence.

Overt Act No. 24:   On or about December 26, 2018, defendant GHAREHBAGLOO transferred approximately $685,205 from his US Bank account ending in 4146 to Inter Valley Escrow for the purchase of the La Cañada Flintridge Residence.

COUNTS TEN THROUGH ELEVEN

[18 U.S.C. §§ 1956(a)(1)(B)(i), 2(a)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other, together with others known and unknown to the Grand Jury, conducted the financial transactions described below, knowing that the property involved represented the proceeds of some form of unlawful activity, which transactions in fact involved the proceeds of specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and wire fraud, in violation of 18 U.S.C. § 1343, and knowing that each of the transactions was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity:

| COUNT | DATE | TRANSACTION |
|---|---|---|
| COUNT TEN | 5/9/2017 | Transfer of approximately $37,500 from defendant KHUDAVERDYAN's J.P. Morgan Chase & Co. ("Chase") account ending in 6783 to Inter Valley Escrow's City National Bank account ending in 2397 on behalf of defendant GHAREHBAGLOO for the purchase of the real property located at 512 S. Via Montana, Burbank, California 91501 (the "Via Montana Residence") |
| COUNT ELEVEN | 6/19/2017 | Transfer of approximately $613,260.84 from defendant KHUDAVERDYAN's Chase account ending in 6783 to Inter Valley Escrow's City National Bank account ending in 2397 on behalf of defendant GHAREHBAGLOO for the purchase of the Via Montana Residence |

COUNTS TWELVE THROUGH THIRTEEN

[18 U.S.C. §§ 1957(a), 2(a)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") and ALEN GHAREHBAGLOO, aka "aghareh1" ("GHAREHBAGLOO"), each aiding and abetting the other, knowingly engaged in a monetary transaction, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, by making the following transfers, such property having been derived from specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, knowing that the funds involved represented the proceeds of some form of unlawful activity:

| COUNT | DATE | TRANSFER |
|-------|------|----------|
| COUNT TWELVE | 5/9/2017 | Transfer of approximately $37,500 from defendant KHUDAVERDYAN's J.P. Morgan Chase & Co. ("Chase") account ending in 6783 to Inter Valley Escrow's City National Bank account ending in 2397 for the purchase of the real property located at 512 S. Via Montana, Burbank, California 91501 (the "Via Montana Residence") |
| COUNT THIRTEEN | 6/19/2017 | Transfer of approximately $613,260.84 from defendant KHUDAVERDYAN's Chase account ending in 6783 to Inter Valley Escrow's City National Bank account ending in 2397 for the purchase of the Via Montana Residence |

COUNTS FOURTEEN THROUGH SIXTEEN

[18 U.S.C. § 1957(a)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") knowingly engaged in a monetary transaction, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, by making the following transfers, such property having been derived from specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, knowing that the funds involved represented the proceeds of some form of unlawful activity:

| COUNT | DATE | TRANSFER |
|---|---|---|
| COUNT FOURTEEN | 12/17/2017 | Transfer of approximately $30,000 from defendant KHUDAVERDYAN's J.P. Morgan Chase & Co. ("Chase") account ending in 6783 to First National Bank of Central Texas account ending in 2637 for the purchase of a 2017 Land Rover Range Rover Sport sport utility vehicle with vehicle identification number SALWZ2FE6HA147419 |
| COUNT FIFTEEN | 1/31/2018 | Transfer of approximately $21,570 from defendant KHUDAVERDYAN's Chase account ending in 6783 to Landmark Escrow's East West Bank account ending in 5649 for the purchase of the real property located at 19715 Eagle Ridge Lane, Northridge, California 91326 (the "Eagle Ridge Residence") |
| COUNT SIXTEEN | 3/15/2018 | Transfer of approximately $374,561.56 from defendant KHUDAVERDYAN's Chase account ending in 6783 to Landmark Escrow's East West Bank account ending in 5649 for the purchase of the Eagle Ridge Residence |

40

COUNTS SEVENTEEN THROUGH TWENTY

[18 U.S.C. § 1957(a)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant ALEN GHAREHBAGLOO, also known as "aghareh1" ("GHAREHBAGLOO") knowingly engaged in a monetary transaction, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, by making the following transfers, such property having been derived from specified unlawful activity, namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, knowing that the funds involved represented the proceeds of some form of unlawful activity:

| COUNT | DATE | TRANSFER |
|-------|------|----------|
| COUNT SEVENTEEN | 1/25/2018 | Transfer of approximately $27,500 from defendant GHAREHBAGLOO's Wells Fargo Bank ("Wells Fargo") joint business account for Top Tier Solutions Inc. ending in 5549 to Wells Fargo account ending in 7380 for the lease of a 2017 Mercedes-Benz S 63 AMG® coupe with vehicle identification number WDDXJ7JB5HA032216 |
| COUNT EIGHTEEN | 12/13/2018 | Transfer of approximately $750,000 from defendant GHAREHBAGLOO's Wells Fargo account ending in 7435 to Inter Valley Escrow's City National Bank account ending in 8671 for the purchase of the real property located at 1435 El Vago Street, La Cañada Flintridge, California 91011 (the "La Cañada Flintridge Residence") |
| COUNT NINETEEN | 12/24/2018 | Transfer of approximately $750,000 from defendant GHAREHBAGLOO's Wells Fargo Bank account ending in 7435 to Inter Valley Escrow's City National Bank account ending in 8671 for the purchase of the La Cañada Flintridge Residence |

| COUNT | DATE | TRANSFER |
|-------|------|----------|
| COUNT TWENTY | 12/26/2018 | Transfer of approximately $685,205 from defendant GHAREHBAGLOO's U.S. Bank account ending in 4146 to Inter Valley Escrow's City National Bank account ending in 8671 for the purchase of the La Cañada Flintridge Residence |

COUNT TWENTY-ONE

[18 U.S.C. § 1028A(a)(1)]

On or about April 22, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARGISHTI KHUDAVERDYAN, also known as ("aka") "Argo," aka "George Gale," aka "akhudav1" ("KHUDAVERDYAN") knowingly transferred, possessed, and used, without lawful authority, means of identification that defendant KHUDAVERDYAN knew belonged to another person, that is, the unique employee number and last four digits of the Social Security number of victim C.R., during and in relation to the offense of Conspiracy to Commit Wire Fraud, a felony violation of Title 18, United States Code, Section 1349, as charged in Count One of this Indictment.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Four of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following property:

    a.    All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense, including but not limited to the following:

- Real property commonly known as 19715 Eagle Ridge Lane, Los Angeles, California 91326 (APN 2701-013-080);

- Real property commonly known as 512 South Via Montana, Burbank, California 91501 (APN 5608-002-023) (the "Via Montana Residence");

- Real property commonly known as 1435 El Vago Street, La Cañada Flintridge, California 91011 (APN 5864-018-005);

- Real property commonly known as 207 West Alameda Avenue, Unit 203, Burbank, California 91502 (APN 2451-034-095);

- $433,687.55 seized from PayPal account ending in 7206;

44

- $3,000 seized from PayPal account ending in 4961;
- $435,178.53 seized from J.P. Morgan Chase & Co. ("Chase") account ending in 6783;
- $600,000 seized from Chase account ending in 7980;
- $8,085.11 seized from PayPal account ending in 1813;
- $519,700.69 seized from Wells Fargo Bank account ending in 7435;
- $250,000 seized from Wells Fargo Bank account ending in 9967;
- $12,740 in U.S. currency seized from the Via Montana Residence; and
- One Rolex Sky-Dweller watch with serial number 58P174943 seized from the Via Montana Residence.

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(2)(A)]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Count Five of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

     a.    All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense, including but not limited to the following:

- Real property commonly known as 512 South Via Montana, Burbank, California 91501 (APN 5608-002-023).

     b.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred,

sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. §§ 982(a)(2)(B), 1030]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 1030 and Title 28, United States Code, Section 2461(c) in the event of any defendant's conviction of the offenses set forth in any of Counts Six through Eight of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

     a.    All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense, including but not limited to the following:

- Real property commonly known as 19715 Eagle Ridge Lane, Los Angeles, California 91326 (APN 2701-013-080);

- Real property commonly known as 512 South Via Montana, Burbank, California 91501 (APN 5608-002-023) (the "Via Montana Residence");

- Real property commonly known as 1435 El Vago Street, La Cañada Flintridge, California 91011 (APN 5864-018-005);

- Real property commonly known as 207 West Alameda Avenue, Unit 203, Burbank, California 91502 (APN 2451-034-095);

- $433,687.55 seized from PayPal account ending in 7206;

- $3,000 seized from PayPal account ending in 4961;

- $435,178.53 seized from J.P. Morgan Chase & Co. ("Chase") account ending in 6783;

- $600,000 seized from Chase account ending in 7980;

- $8,085.11 seized from PayPal account ending in 1813;

- $519,700.69 seized from Wells Fargo Bank account ending in 7435;

- $250,000 seized from Wells Fargo Bank account ending in 9967;

- $12,740 in U.S. currency seized from the Via Montana Residence; and

- One Rolex Sky-Dweller watch with serial number 58P174943 seized from the Via Montana Residence.

b.   Any personal property used or intended to be used to commit the offense; and

c.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs a and b.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1030(i), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due

diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Nine through Twenty of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

a.   Any property, real or personal, involved in such offense, and any property traceable to such property, including but not limited to the following:

- Real property commonly known as 19715 Eagle Ridge Lane, Los Angeles, California 91326 (APN 2701-013-080);

- Real property commonly known as 512 South Via Montana, Burbank, California 91501 (APN 5608-002-023) (the "Via Montana Residence");

- Real property commonly known as 1435 El Vago Street, La Cañada Flintridge, California 91011 (APN 5864-018-005);

- Real property commonly known as 207 West Alameda Avenue, Unit 203, Burbank, California 91502 (APN 2451-034-095);

- $433,687.55 seized from PayPal account ending in 7206;

- $3,000 seized from PayPal account ending in 4961;
- $435,178.53 seized from J.P. Morgan Chase & Co. ("Chase") account ending in 6783;
- $600,000 seized from Chase account ending in 7980;
- $8,085.11 seized from PayPal account ending in 1813;
- $519,700.69 seized from Wells Fargo Bank account ending in 7435;
- $250,000 seized from Wells Fargo Bank account ending in 9967;
- $12,740 in U.S. currency seized from the Via Montana Residence; and
- One Rolex Sky-Dweller watch with serial number 58P174943 seized from the Via Montana Residence.

b.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be

ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any 12-month period.

FORFEITURE ALLEGATION FIVE

[18 U.S.C. §§ 982(a)(2)(B), 1028]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 1028 and Title 28, United States Code, Section 2461(c) in the event of any defendant's conviction of the offense set forth in Count Twenty-One of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

a.    All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense, including but not limited to the following:

- Real property commonly known as 19715 Eagle Ridge Lane, Los Angeles, California 91326 (APN 2701-013-080);
- Real property commonly known as 512 South Via Montana, Burbank, California 91501 (APN 5608-002-023) (the "Via Montana Residence");
- Real property commonly known as 1435 El Vago Street, La Cañada Flintridge, California 91011 (APN 5864-018-005);
- Real property commonly known as 207 West Alameda Avenue, Unit 203, Burbank, California 91502 (APN 2451-034-095);
- $433,687.55 seized from PayPal account ending in 7206;

54

- $3,000 seized from PayPal account ending in 4961;
- $435,178.53 seized from J.P. Morgan Chase & Co. ("Chase") account ending in 6783;
- $600,000 seized from Chase account ending in 7980;
- $8,085.11 seized from PayPal account ending in 1813;
- $519,700.69 seized from Wells Fargo Bank account ending in 7435;
- $250,000 seized from Wells Fargo Bank account ending in 9967;
- $12,740 in U.S. currency seized from the Via Montana Residence; and
- One Rolex Sky-Dweller watch with serial number 58P174943 seized from the Via Montana Residence.

b.   Any personal property used or intended to be used to commit the offense; and

c.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs a and b.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1028(g), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

been commingled with other property that cannot be divided without difficulty.

                                        A TRUE BILL


                                        _/s/_____
                                        Foreperson


NICOLA T. HANNA
United States Attorney


*Ryan White for*

PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division

RYAN WHITE
Assistant United States Attorney
Chief, Cyber & Intellectual
  Property Crimes Section

JENNIE L. WANG
Assistant United States Attorney
Deputy Chief, Cyber & Intellectual
  Property Crimes Section