1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
HONORABLE STEPHEN V. WILSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,

        Plaintiff,

 v.                               Case No.
                                   2:19-cr-00339-SVW
ARGISHTI KHUDAVERDYAN,

        Defendant.
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS
MOTION FOR FORFEITURE OF BOND
SEPTEMBER 19, 2022
11:10 A.M.
LOS ANGELES, CALIFORNIA

APPEARANCES

FOR THE GOVERNMENT:
MR. ROBERT I. LESTER
MS. LISA E. FELDMAN
Assistant United States Attorney
300 North Los Angeles Street
Suite 7516
Los Angeles, California 90012


FOR THE DEFENDANT:
MR. ARGISHTI KHUDAVERDYAN, Pro se

MR. KENNETH A. REED, Standby Counsel

_____

JUDY K. MOORE, CRR, RMR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, #4455
LOS ANGELES, CALIFORNIA 90012
213.894.3539

1                    (Proceedings commenced at 11:10 a.m.)
2                    COURTROOM DEPUTY:  Item 2, CR 19-339-SVW, United
3    States of America vs. Argishti Khudaverdyan.
4                    Counsel, please state your appearances.
5                    MR. LESTER:  Good morning, your Honor.  Assistant
6    United States Attorney Robert Lester for the Government.
7                    THE COURT:  And I see Mr. Khudaverdyan is here,
8    still pro se.  And Mr. Reed, advisory counsel, is in the
9    spectator part of the courtroom, correct?
10                   MR. REED:  Yes, your Honor.
11                   THE COURT:  Let me ask you about your motion, Mr.
12   Lester.  This stems from the defendant's failure to appear at a
13   status conference while he was on bond?
14                   MR. LESTER:  Yes.  It's a little more than that
15   because, not only did he not appear, but he absconded from
16   probation -- I mean from pretrial supervision until he was
17   arrested approximately nine months later.
18                   THE COURT:  I see.  And in terms of forfeiting bond,
19   what are the factors?
20                   MR. LESTER:  Well, in terms of forfeiting, it's just
21   a question of whether there is a violation of a condition of
22   bond.
23                   THE COURT:  Well, I mean, is it as day follows
24   night, as night follows day, or are there balancing interests
25   to be considered?

1  MR. LESTER: That requires a little bit of an
2  explanation. Federal Criminal Procedure 46(f), as in Frank, 1
3  says that, "The Court shall forfeit a bond" if there's a
4  violation. So that part is mandatory under the Federal Rules
5  of Criminal Procedure if the Court finds a violation.
6  Then if the defendant and/or the surety want to try
7  to get out from under the violation, they can move to -- to
8  remit partially or completely, or they could just defend right
9  now and try to minimize the judgment amount. And there's a
10 six-part test that applies -- it applies particularly to
11 sureties, but most of the factors apply also to the defendant.
12 And they have the burden of showing why they should get out
13 from under the bond forfeiture.
14 THE COURT: All right. You're distinguishing the
15 surety from the defendant?
16 MR. LESTER: Only because the way the factors are
17 written, they all apply to a surety, but two of them, I
18 believe, do not specifically apply to the defendant. So,
19 really, when you look at a defendant, motion to remit or
20 whatever, it's a four-part factor.
21 THE COURT: I mean, in terms of the factors, the
22 party offended or affected is the surety. I mean, that's the
23 person who will suffer the loss if the bond is forfeited.
24 MR. LESTER: That's not quite right. A bond
25 forfeiture motion typically, and in this case is, brought

1  against the defendant and the surety and asks that they be held
2  jointly and severally liable.
3          THE COURT: And that is the way the procedure goes.
4          MR. LESTER: Yes. I'll acknowledge that it's the
5  surety who put up equity in a house, whereas the defendant is,
6  you might call, unsecured, but they both have liability at
7  stake.
8          THE COURT: And how do you argue the factors as the
9  record reflects them now?
10         MR. LESTER: Well, the first factor -- I don't think
11 I included them in the brief, but the first factor -- maybe I
12 should say to the Court, the six factors are articulated in a
13 number of cases, including *U.S. vs. Nguyen*, N-G-U-Y-E-N, 279
14 F.3d 1112 at 1116 to 117 -- 1117, 9th Circuit 2002.
15         So I'll have to do them from memory. The first
16 factor is voluntariness of the violation, in other words, was
17 it willful? Willful, I think, is the better term. Was the
18 violation willful or was it somehow accidental? I can imagine,
19 for example, if a defendant somehow stepped over the border of
20 the Central District into the Southern District and that would
21 be quite possibly not willful. This is different, I think. I
22 don't think the defendant's going to claim that this wasn't
23 willful.
24         THE COURT: Well, what makes it willful here?
25         MR. LESTER: Well, I suppose if he had been

1  kidnapped and taken away from the Court I would see that he --
2              THE COURT:  But the trigger was his not appearing at
3  a status conference while he was on bond, and was the status
4  conference to set a trial date, or were there other dates set
5  at that time?
6              MR. LESTER:  I'm not sure.  I have the PACER
7  printout.  I'm not the trial lawyer --
8              THE COURT:  They're here.  I see them in the first
9  row.
10             MS. FELDMAN:  Good morning, your Honor.  Lisa
11 Feldman on behalf of the United States.  So I don't remember at
12 the moment the exact purpose of that hearing.  I think it may
13 have been to set a date.  But what was willful in that, the
14 Court may recall that the pre-trial service officer, I think
15 his name was Manuel Ibanez, came to the hearing and explained
16 to the Court how he had had a conversation on the phone with
17 the defendant earlier that week explaining that he needed to be
18 at the hearing and the defendant -- I'm paraphrasing -- took
19 the position that Mr. Ibanez was not an officer of the Court
20 and that he did not have to be there.
21             THE COURT:  I see.
22             MS. FELDMAN:  I have this detailed in a motion that
23 was filed earlier, but, essentially, he -- and this would be in
24 the record.  And by the end of the phone call, the pre-trial
25 service officer said, you need to be there, and he didn't

1 answer. But he was certainly put on notice. He was also --
2         THE COURT: And how -- refresh my memory as to the
3 circumstances in which he was taken back into custody, or taken
4 into custody.
5         MS. FELDMAN: He was arrested at a gym. The Court
6 had issued a bench warrant at the time of the status conference
7 after hearing from the pre-trial service officer. And I should
8 also add that there's another pre-trial service officer who
9 also had emailed the defendant.
10         THE COURT: But you're saying -- or argue that, from
11 the time the Court issued the warrant, it took nine months to
12 arrest him or...
13         MS. FELDMAN: The Government had -- and let me back
14 up a little bit just to give the Court the fuller picture. The
15 defendant also -- and I believe -- I wouldn't have said at that
16 time, but he also stopped checking in with the pre-trial
17 service officers, and they ultimately declared him absconded.
18         THE COURT: Had he been doing that prior to this
19 event?
20         MS. FELDMAN: He had been. That's my understanding.
21         THE COURT: All right. Then let's get back to Mr.
22 Lester.
23         MS. FELDMAN: Thank you, your Honor.
24         THE COURT: Okay. So that's a factor. That's one
25 factor. Go through the factors for me.

1   MR. LESTER: The second factor has to do with the
2   surety only, and that is whether the surety brought the
3   defendant back to justice, if I recall correctly.
4   THE COURT: And what does the record show in that
5   regard?
6   MR. LESTER: The record shows nothing but that the
7   marshal's office is the one, I think, who arrested him.
8   THE COURT: All right. What's the next factor?
9   MR. LESTER: The third factor -- testing my memory.
10  The third factor is... Well, maybe I can go backwards. It may
11  help me to do it this way: The sixth and final factor is
12  whether the dollar amount of the bond is basically proportional
13  to the charges that he was facing. In other words, it's a
14  liquidated damages type of penalty.
15  THE COURT: Yeah, I need some further explanation on
16  that factor.
17  MR. LESTER: Okay. So defendants will typically
18  argue -- or sureties will typically argue, hey, it doesn't cost
19  the Government X number of dollars, whatever the bond was set
20  at, in order to remedy the violation. And the answer to that
21  is the -- and the 9th Circuit has made it pretty clear -- is
22  that's not what the sixth factor means. It's a liquidated
23  damages cost. Think of it in terms of a contract. When nobody
24  's performed the contract yet, it's hard to know what the
25  damages will be, so they set -- I hate to use the word

1  arbitrary, but they come up with a reasonable figure to try
2  to --
3              THE COURT: And under the statute, is the
4  liquidating damage analysis the one that solely governs?
5              MR. LESTER: Under the 9th Circuit cases, the sixth
6  factor about liquidated damages is interpreted solely that way,
7  and that is whether it was a reasonable bond figure --
8              THE COURT: Well, assuming that that's what the case
9  says, how does the bond relate to the risk or the case? What
10 was the amount of the bond again?
11             MR. LESTER: 200,000.
12             THE COURT: 200,000?
13             MR. LESTER: Yes.
14             THE COURT: And so how -- what would the $200,000 be
15 compared to in determining reasonableness?
16             MR. LESTER: Well, I suppose it would be compared to
17 other cases.
18             THE COURT: Other cases? In what respect?
19             MR. LESTER: That interpret this particular
20 criterion.
21             THE COURT: I don't understand that. I mean, in
22 other words, the bond was $200,000. The loss, at least as per
23 the indictment, was in the millions, correct?
24             MR. LESTER: That's my understanding, yes.
25             THE COURT: But is the loss that was charged a

1  proper comparison to the bond?
2          MR. LESTER: I don't think that that's the sole
3  factor that a magistrate judge uses when determining the amount
4  of the bond. Part of it is -- well, part of it is whether he's
5  likely to flee --
6          THE COURT: But, I mean, the bond was set at
7  $200,000. That is the figure we're working with. Or are you
8  saying that the amount should be reconsidered at this juncture?
9          MR. LESTER: I'm not saying that. I think --
10         THE COURT: Then what -- then explain that factor
11 again to me.
12         MR. LESTER: The magistrate judge has to determine
13 the seriousness of the charge, look at the seriousness of the
14 charge; the likelihood the defendant is -- the likelihood the
15 defendant is going to flee if he's let --
16         THE COURT: Well, I'm -- my question was, assuming
17 that the bond was correctly set by the magistrate, how does
18 this comparative analysis work at this point? Once the bond is
19 correctly set, your first response was that the case law
20 supports the idea that the bond is just liquidated in that
21 amount, but you said something about comparing the amount of
22 the bond to another factor, and that's where I got a little
23 lost.
24         MR. LESTER: Well, I think in the analysis of the
25 decisions that I've seen, the Court wants to look at, as I

1  mentioned, not just the charges but the likelihood he'll flee,
2  the likelihood he'll cause economic or other damage to other
3  people if he's out, and then look at other cases -- there are
4  other cases that have gone through this analysis -- and see how
5  the Court --
6          THE COURT:  You seem to be saying that the Court
7  should consider whether the bond was initially correctly set.
8          MR. LESTER:  Not correctly exactly, but was it a
9  reasonable figure given the factors?
10         THE COURT:  Given what factors?
11         MR. LESTER:  The factors that I've mentioned.
12         THE COURT:  But those are the factors that the
13 magistrate sets in setting the bond.
14         MR. LESTER:  Yes.
15         THE COURT:  So you're asking the -- you're saying
16 that that factor requires the Court to reconsider what the
17 magistrate did at the outset?
18         MR. LESTER:  I wouldn't use -- I'll tell you what my
19 concern is.  I'm hearing the word "reconsider," and it makes it
20 sound like de novo review, and I don't think that that's what
21 the Courts are trying to ask --
22         THE COURT:  Let's get to another factor.  I'll give
23 this a better look.  Go ahead.
24         MR. LESTER:  Okay.  One of the factors is whether
25 there are any basically special factors.  They didn't use the

1 term exactly that way but special factors that the Court should
2 consider in whether to --
3     THE COURT:  What does that mean, special?
4     MR. LESTER:  It means is there any other factor that
5 the defendant can show or the surety can show that should
6 justify leniency, for lack of a better term.
7     THE COURT:  I see.  Well, what has the surety
8 demonstrated so far?
9     MR. LESTER:  Nothing whatsoever.
10     THE COURT:  I see.  And when was the surety supposed
11 to respond?
12     MR. LESTER:  There's two -- there's two times a
13 surety can respond.  One was in an opposition to this motion
14 that's before you.  The other is, the surety or the defendant
15 can respond, in effect, by filing a motion for emission of
16 either the entirety of the forfeiture or part of it.  So they
17 can -- if they want to raise these issues, they can file
18 something --
19     THE COURT:  Nothing has been filed so far.
20     MR. LESTER:  Correct.  They did send -- the surety
21 sent us a document that was not intelligible, and I think the
22 Court struck it, or at least the staff struck it.  The
23 defendant hasn't filed anything.
24     THE COURT:  I see.  Is the surety here today?
25     MR. LESTER:  That's my understanding.

1  THE COURT: Is the surety here? Are you? Would you
2  identify yourself? Would you take the lectern, sir? Would you
3  identify yourself?
4  MR. SAMVELIAN: Allen Samvelian.
5  THE COURT: And even though you have not made the
6  filings which were available, I will nevertheless hear from
7  you. What is your position regarding the forfeiture?
8  MR. SAMVELIAN: Sir, at the time I posted bond, the
9  prosecutor told me, make sure when the trial starts, he has to
10 be in the court. You know that. That's the deal. He will be
11 in the court when the trial starts. And he said -- she told me
12 it's okay, sign it. I signed it, I put my house, $200,000
13 bond. But on --
14 THE COURT: Did you read the agreement?
15 MR. SAMVELIAN: No, I didn't read it.
16 THE COURT: Why didn't you?
17 MR. SAMVELIAN: Because she explain me that. She
18 just told me, just -- if you sign this, you know, he has to be
19 in a trial, he has to be in a court. If not, you know, your
20 200,000 going to go -- I said, okay, he's --
21 THE COURT: So are you saying that it was your
22 thought that if he doesn't make appearances as required before
23 the trial and the Government has to expend resources to arrest
24 him, that wouldn't trigger your responsibility as long as the
25 defendant appeared at a trial?

1  MR. SAMVELIAN: That part I didn't understand, but
2 one thing I know, the day he didn't show up I found out later
3 on, but he was in his home. Nine months he was in his home.
4 And I met with him, I make sure he go to the trial. I always
5 we talk about it. And he was his home. Nobody say anything,
6 nobody come after him. After nine months, I heard LAPD issued
7 another warrant to arrest him. And I surprised. I said,
8 what's going on? I mean, he was here nine months. He's at
9 home, he's at gym, he's my home, he's his aunt's home for
10 dinner.
11  THE COURT: What is your relationship to Mr.
12 Khudaverdyan?
13  MR. SAMVELIAN: My nephew.
14  THE COURT: I see.
15  MR. SAMVELIAN: And he was coming to my house every
16 time dinner. He's living his house. Once in a while he
17 called, I'm alone, come, we watch movie together. And nobody
18 there. And I thought so maybe everything has been solved,
19 that's why they don't go after him.
20  THE COURT: Did anyone contact you after the -- Mr.
21 Khudaverdyan didn't make the appearance that led to the arrest?
22  MR. SAMVELIAN: Yes, sir.
23  THE COURT: Who contacted you?
24  MR. SAMVELIAN: From 213 area code. It was, I
25 believe -- I believe it was the, what you call it, the...

1  THE DEFENDANT: Probation.
2  MR. SAMVELIAN: Probation officer.
3  THE COURT: And what did the probation officer tell
4  you?
5  MR. SAMVELIAN: He told me, where is Argishti
6  Khudaverdyan? I said, what I know, it's a long weekend, I
7  believe he's in Palm Springs or someplace. Said, okay, so
8  what's the address? I said, I don't know, honestly, just --
9  THE COURT: And what was the time frame between the
10 probation officer contacting you and the date that the
11 defendant didn't appear at the status conference?
12 MR. SAMVELIAN: I don't recall, sir.
13 THE COURT: Does the Government know that history?
14 MR. SAMVELIAN: I don't recall.
15 THE COURT: Do you know that?
16 MR. LESTER: I don't know off the top of my head.
17 THE COURT: I see.
18 MR. SAMVELIAN: But he was -- he was back in three
19 or four days. He was at his home. He called me.
20 THE COURT: Well, but did you ever contact the
21 probation officer after the probation officer contacted you and
22 inform the probation officer that he was with you?
23 MR. SAMVELIAN: I don't recall, sir.
24 THE COURT: You say you don't recall?
25 MR. SAMVELIAN: I don't recall I called or not

1  because it's about two years.
2           THE COURT:  I see.
3           MR. SAMVELIAN:  But one thing I know, when he comes
4  back, we met and I told him, the probation officer called me
5  about you.  He said, okay, I'm home.  I said, I don't know.
6  The probation officer told me he's going to issue arrest
7  warrant.  He said, I'm home.  Let them come and arrest if there
8  is an arrest warrant.  And nine months, nobody show up until
9  LAPD issue another arrest warrant.  So that's why I said the
10 other arrest warrant is bogus, because nobody show up.
11          THE COURT:  I see.  All right.  Thank you.
12          MR. SAMVELIAN:  And it's my house, and they don't
13 want anybody talk to me.  And that's my life.  I have a family.
14 I have a kid.  And what they're trying to do just to take the
15 money.  If they work hard, I give them $500, whatever they
16 spent time on this case, on my case, not the case of Argishti
17 Khudaverdyan, on my thing, I'm willing to pay whatever hours
18 they put, 500, 1,000, but I'm -- I wouldn't leave my kids on
19 the street because of they're trying to do something which is
20 not --
21          THE COURT:  I have your position in mind.  Thank
22 you.  You may be seated if you wish.
23          MR. SAMVELIAN:  Thank you, your Honor.
24          THE COURT:  Yes.  How does the defendant's -- I mean
25 the surety's position factor into the analysis if I accept what

1  the surety said?
2          MR. LESTER:  I don't think I heard the surety say
3  that he called the probation officer back -- or I think it was
4  pre-trial -- back to say, oh, he's here, come and get him.
5  That would have been a significant plus factor for him.  I
6  didn't hear him say that.
7          MS. FELDMAN:  Your Honor, may I just add a little
8  bit to this?  It's my understanding that the probation officer,
9  again, Officer Manuel Ibanez, did try hard to reach out to both
10 the defendant and the surety and was unable to locate the
11 defendant and --
12         THE COURT:  Well, is that officer here?
13         MS. FELDMAN:  I don't believe so.  Not today, no,
14 but I'm sure we could bring him in if the Court wished that.
15         THE COURT:  I'd like to hear from that.  Is that
16 person located in Los Angeles?
17         MS. FELDMAN:  I believe so, your Honor.  And the FBI
18 also looked for the defendant for a period of time and also
19 made inquiries and looked in different places and made
20 inquiries --
21         THE COURT:  Did the FBI contact the surety?
22         MS. FELDMAN:  I believe he did.
23         THE COURT:  Well, I mean, the surety seems to
24 indicate that that didn't happen.  I'm going to schedule a
25 further hearing on this, and if the FBI agent had some contact

1 or if the probation officer had some contact with the surety,
2 I'd like to know what that contact was because it may be
3 relevant in balancing all the factors.
4         MS. FELDMAN: Yes, sir.
5         THE COURT: So let's reschedule that for next
6 Monday. No, not next Monday. Let's schedule that for two
7 Mondays from now.
8         MS. FELDMAN: Two Mondays. At what time, your
9 Honor?
10         THE COURT: Make it at 10:30.
11         MS. FELDMAN: And just to clarify, I don't know how
12 relevant it is, but AUSA Jennie Wang had originally indicted
13 the case, so any discussions that were had with the surety were
14 with Assistant United States Attorney Jennie Wang.
15         THE COURT: All right. Well, she should be
16 available if it's relevant.
17         MS. FELDMAN: She's no longer in the office, but if
18 the Court wishes to hear from her, I'm sure she can appear.
19         COURTROOM DEPUTY: Further hearing will be
20 October 3rd at 10:30 a.m.
21         MS. FELDMAN: Thank you.
22         (Proceedings concluded at 11:36 a.m.)
23
24
25

0

1      CERTIFICATE OF OFFICIAL REPORTER

3  COUNTY OF LOS ANGELES    )
                            )
4  STATE OF CALIFORNIA      )

6          I, JUDY K. MOORE, FEDERAL OFFICIAL REALTIME COURT
7  REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE
8  CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT
9  TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING
10 IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY
11 REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT
12 THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE
13 REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

17          DATED THIS 22ND DAY OF SEPTEMBER, 2022.

                         /s/Judy K. Moore
                   _____
                         JUDY K. MOORE, CRR, RMR
                       FEDERAL OFFICIAL COURT REPORTER